2014 VT 85

## State of Vermont v. Yetha I. Lumumba

[104 A.3d 627]

No. 12-254

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**

Opinion Filed August 1, 2014

Motion for Reargument Denied As Untimely Filed October 10, 2014

William H. Sorrell, Attorney General, and David Tartter and John R. Treadwell, Assistant Attorneys General, Montpelier, for Plaintiff-Appellee.

Matthew F. Valerio, Defender General, and Joshua S. O'Hara, Appellate Defender, Montpelier, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Defendant Yetha Lumumba was born in the Democratic Republic of Congo, and immigrated to the United States in 2004, where he is a legal permanent resident. In 2012, defendant, then a student at the University of Vermont (UVM), was convicted of sexual assault of a fellow student. Evidence presented at trial showed that in June of 2010 defendant and the victim, J.B., met up for a bike ride to a Burlington beach where they drank beer and talked, and which ended in oral sex that J.B. felt was nonconsensual. Several months later, in the fall of 2010, J.B. reported the incident and defendant was subsequently charged with sexual assault against J.B. After a three-day jury trial, defendant was found guilty and received a sentence of eight years to life in prison.

¶ 2. Defendant appeals his conviction, arguing that the trial court committed reversible error at three points in the trial: (1) in allowing a clinical psychologist to give expert testimony about common reactions and behaviors of rape victims in between J.B.'s testimony and the defense's cross-examination of J.B.; (2) in not permitting defense counsel to have J.B. look over transcripts of her prior testimony during cross-examination to determine whether she had made a prior inconsistent statement; and (3) in admitting hearsay testimony from a UVM police officer who met with J.B. Defendant also raises an issue with the court's sentence, arguing that his immigration status prevents him from meeting Vermont's statutory requirement for sex-offender counseling prior to release from incarceration, thereby effectively sentencing him to a disproportionately harsh punishment of life in prison without the possibility of parole in violation of the Eighth Amendment. We address each issue in turn. We affirm the challenges to the trial court's evidentiary rulings but reverse and remand on sentencing.

## I.

¶ 3. The trial court decides whether evidence is admissible in the first instance. See V.R.E. 104(a) ("Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court."). On review, we generally accord deference to the court's decision to admit or deny evidence, and will reverse the trial court's ruling "only when there has been an abuse of discretion that resulted in prejudice." *State v. Desautels*, 2006 VT 84, ¶ 12, 180 Vt. 189, 908 A.2d 463.

¶ 4. Defendant's first claim of reversible error is that the trial court impermissibly allowed in expert testimony used to bolster J.B.'s credibility as a witness. Specifically, defendant argues that the State tailored its expert's testimony on common assault-victim behavior to mirror J.B.'s testimony, thereby lending credibility to her behaviors during and after the incident, and that the trial court compounded this prejudice by allowing the expert to testify in between the direct and cross-examinations of J.B.

¶ 5. ▮ Vermont's Rules of Evidence afford the court broad discretion to admit expert testimony where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." V.R.E. 702; *State v. Hazelton*, 2009 VT 93, ¶ 16, 186 Vt. 342, 987 A.2d 915. Beginning with *State v. Catsam*, this Court has repeatedly observed that expert testimony regarding the profile of sexual assault victims may greatly assist juries in assessing the credibility of complaining witnesses. 148 Vt. 366, 369, 534 A.2d 184, 187 (1987); see also *Hazelton*, 2009 VT 93, ¶ 16; *State v. Gokey*, 154 Vt. 129, 133-37, 574 A.2d 766, 768-70 (1990). In *Catsam*, we noted that the "unique psychological effects of sexual assault on children place the average juror at a disadvantage in understanding the behavior of the victim." 148 Vt. at 369, 534 A.2d at 187. To that end, expert testimony has "demonstrated usefulness" in providing a jury "with the benefit of a better understanding of the emotional antecedents of the victim's conduct." *Id.* In situations where a victim's behavior may seem "superficially bizarre," for example, expert testimony can "dispel misconceptions about the behavior of victims" and "show that the conduct of the complaining witness, however seemingly unusual, is consistent with the [victim] profile." *Gokey*, 154 Vt. at 133, 574 Vt. at 768. Such behavior might include a delay in reporting, recantation, or a continued relationship with

an alleged abuser. *Id.* at 133-34, 574 A.2d at 768. While initially raised in cases involving child victims, this reasoning has since been extended to adult victims of sexual assault as well, under the logical corollary that "[a]s with child sexual abuse victims, the jury may be at a loss to understand the behavior of [an adult] rape victim." *State v. Kinney*, 171 Vt. 239, 250, 762 A.2d 833, 842 (2000). The fact that such expert testimony may lead to inferences that bolster a victim's credibility in the eyes of the jury does not automatically render such testimony inadmissible. *Hazelton*, 2009 VT 93, ¶ 16.

¶ 6. ■ Nonetheless, there are limits on what this type of expert testimony may include. Of particular concern is expert testimony that "is the equivalent of a *direct comment* on the credibility of the testifying complainant." *Catsam*, 148 Vt. at 370, 534 A.2d at 188 (emphasis added). In *Catsam*, where we first decided this issue, the expert testified that children with post-traumatic stress disorder (PTSD) were not likely to make up stories about sexual abuse, and then concluded that, in her opinion, the child victim suffered from PTSD. We stated there that such testimony "went beyond the psychological and emotional profile" of a PTSD victim and "[w]hen viewed as a whole . . . was tantamount to a direct comment that the complainant was telling the truth about the alleged sexual assault for which the defendant was charged." *Id.*

¶ 7. By contrast, in *Kinney*, where the expert testified generally about rape trauma syndrome and the behavioral patterns of sexual assault victims, but never interviewed the victim or offered the jury an opinion as to whether the victim exhibited any common behaviors of a sexual assault victim, "there was little risk that [the expert] would be seen as a truth detector." 171 Vt. at 251, 762 A.2d at 843. When the *Kinney* expert then went further, and subsequently testified that "at least 98% of the rapes reported actually occurred," we then deemed the testimony to have tipped "over the line" because the jury could infer that scientific studies have shown that the victim is most likely telling the truth and convict the defendant on that basis. *Id.* at 252-53, 762 A.2d at 844.

¶ 8. ■ In sum, our case law in this area has established a firm line between testimony that may properly *educate* juries about the behaviors of victims and that which *directly comments* on the victim's truthfulness, the defendant's guilt, or whether the victim

was in fact sexually abused. See *Gokey*, 154 Vt. at 134, 574 A.2d at 768 ("While the expert may state that the complaining witness exhibits symptoms typical of sexually abused children, she may not, at least on this record, go so far as to conclude that the witness *is* a victim of sexual abuse."); see also *Hazelton*, 2009 VT 93, ¶ 17 (stating that testimony was admissible because expert "did not offer his expert opinion as to [victim's] truthfulness or the truthfulness of sexual assault victims generally"); *State v. Percy*, 146 Vt. 475, 483, 507 A.2d 955, 960 (1986) (holding that expert's testimony that most rapists commonly claim consent or amnesia should have been excluded because it "did not provide jurors with an explanation" but simply cast doubt on defendant's credibility).

¶ 9. ▮ The expert testimony in this case did not cross that line. Unlike in *Catsam*, the expert here did not testify about the statistical likelihood that J.B. was telling the truth. Nor did she testify as to the statistical likelihood that defendant was lying, or go so far as to conclude that J.B. was a victim of sexual abuse. Cf. *Kinney*, 171 Vt. at 252, 762 A.2d at 843; *Percy*, 146 Vt. at 483, 507 A.2d at 960. Prior to trial, the expert had never met either J.B. or defendant. She reviewed J.B.'s deposition and the affidavit of probable cause, but did not testify about either J.B. or defendant individually. Instead, the expert testified as to various "rape myths," and the "huge array of reactions" that female sexual assault victims may have — including "freezing," "bargaining," or continuing to communicate with assailants. The fact that this testimony included many behaviors exhibited by J.B. does not qualify as direct commentary on J.B.; rather, it served the permissible purpose of assisting the jury to place J.B.'s behavior following the incident with defendant into the context of common sexual-assault victim behaviors. Though the testimony may have served a "primarily rehabilitative" function for the prosecution and bolstered J.B.'s credibility, that does not automatically render it inadmissible. *Gokey*, 154 Vt. at 133, 574 A.2d at 768. The expert's testimony was within the boundaries of permissible evidence regarding the profile and common behaviors of sexual-assault victims, and it was not error for the trial court to allow it.[1]

---

[1] There is some question as to whether defendant's objection to the expert's testimony was properly preserved for appeal. Prior to trial, defendant filed a motion to exclude or limit the expert's testimony, which the court denied. At trial,

¶ 10. ■ ■ Nor was it reversible error for the trial court to allow the State's expert to testify between J.B.'s direct examination and the defense's cross-examination of J.B. due to "scheduling conflicts." "[T]he exercise of a trial judge's control over the order of evidence presented is a matter for the discretion of the trial judge" and "[d]iscretionary rulings are not subject to review if there is a reasonable basis for the court's action." *Cliche v. Fair*, 145 Vt. 258, 261, 487 A.2d 145, 148 (1984) (quotation omitted); V.R.E. 611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence . . . ."); see also *State v. Tatko*, 119 Vt. 459, 463, 128 A.2d 663, 666 (1957) ("[R]ules for the introduction of evidence serve well the conduct of the trial, but they do not have the effect of conferring a right upon the parties litigant to any established pattern."). Here, scheduling was a reasonable basis for the court's actions, and defendant was not denied the opportunity to cross-examine the witness in front of the jury. There was therefore no reversible error in the timing of the expert's testimony between J.B.'s direct and cross-examinations.

¶ 11. Defendant next argues that the trial court committed reversible error during the cross-examination itself in not requiring J.B. to review transcripts in order to confirm an inconsistency in her prior testimony. On the second day of defendant's cross-examination of J.B., she testified that in the course of giving defendant oral sex she showed him she was uncomfortable by "putting my hands over my face." After confirming that J.B. previously made statements about the incident to a detective and at a hearing, defense counsel then asked J.B. whether she had ever mentioned putting up her hands in those prior recountings. J.B. replied that she could not remember whether she mentioned it or not, and defense counsel then requested that she look at the transcripts to confirm whether she ever made such a statement in

the defense first objected to the timing of the expert's testimony taking place between J.B.'s direct and cross-examinations. Then, after the State offered the psychologist as an expert to the court, the court asked if defendant objected and counsel replied, "[n]o objection to that in psychology, Your Honor. However, I do want to renew my objections that I had stated previously regarding this witness." It is unclear whether this objection referred to the prior objection over the timing of the testimony or to the content of the testimony, although the phrase "[n]o objection to that in psychology" suggests the former. Regardless, as we hold that the expert's testimony was admissible, the questionable preservation of this objection does not affect the outcome of this issue.

her previous testimony. The State objected, arguing that it would take an hour or more for J.B. to review over a hundred pages of transcripts from her previous testimonies, and the court denied the request. Defendant argues that by denying his request for J.B. to review the transcripts, the trial court deprived him of his constitutional right to confront J.B. and impeach her with a prior inconsistent statement. After defendant was convicted, he filed a motion for a new trial raising this issue as partial ground for that request, which the trial court again denied.

¶ 12. The trial court may exclude evidence, even if relevant, for "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." V.R.E. 403. Likewise, the rules give the court power to "exercise reasonable control" over the presentation of evidence to make "interrogation and presentation orderly and effective" and to "avoid needless consumption of time." V.R.E. 611(a).

¶ 13. ▮ The court's decision not to force the witness to peruse over a hundred pages of testimony falls within the purview of "reasonable control" in an attempt to "avoid needless consumption of time." Defendant was afforded the opportunity to conduct a thorough cross-examination of J.B., during which defense counsel established a number of inconsistencies with her past statements by having her read portions of her prior testimony. In *Jones v. State*, an Alaskan court held that it was not error for the trial court to refuse to allow a witness to read a 172-page transcript to confirm that she had not made a certain statement in her deposition testimony. 812 P.2d 613, 618-19 (Alaska Ct. App. 1991). The *Jones* court reasoned that forcing a witness to read hundreds of pages "would have caused undue delay in the trial," "would have been an inefficient use of the court's time," and that there were "time-saving alternatives available to [defendant]" such as having a third party testify that the statement was not present in the transcripts. *Id.* at 619. Defendant does not point to any cases where this Court or others have found error in not forcing a witness to review past testimony for an omission proving a previous inconsistent statement. We follow the *Jones* court's logic and hold there was no abuse of discretion here for the same reasons.

¶ 14. Further, although defendant contends that the jury was left with the "unimpeached impression" that J.B. testified to

covering her mouth, the jury was not left unaware of this issue. Defense counsel questioned J.B. about it twice, and J.B. admitted that she did not recall if she testified to putting her hands over her mouth at any point during her testimony on three separate occasions — her discussion with the police detective, at the bail hearing, or at her deposition. J.B. went on to confirm that she had reviewed all of the transcripts of her testimony in preparation for the trial and still couldn't remember whether they contained any previous mention of her putting her hands over her mouth but admitted "it's possible" that they did not. Then, in its closing argument, defense counsel clearly stated that "[d]uring trial, she stated that she put her hands up in front of her mouth, yet at no prior hearing or interview or deposition does this crucial fact come out" — thereby ensuring that the jury was aware of this inconsistency. Ultimately, this inconsistency was one of a number of inconsistencies[2] the defense established in J.B.'s various retellings of the incident under oath, which the jury was fully aware of, and yet still found her credible. The defendant was not denied his constitutional right to cross-examine J.B., nor was he denied all opportunity to impeach her as to any inconsistency in her prior testimony about where her hands were during the incident. The trial court's ruling was a limited denial of the request for J.B. to review the entirety of her previous sworn testimony to confirm that she did not make that statement. There were other more efficient methods for the defense to make this same point, and it was not error for the trial court to rule as such.

¶ 15. Next, we address the third and final evidentiary issue raised by defendant: that a UVM police officer's testimony included inadmissible hearsay statements made by J.B. to the officer during an interview about the delay in her reporting of the incident and why she eventually came forward. Prior to the trial, the State filed a motion requesting the officer's testimony be admitted under the hearsay exceptions in Vermont Rules of Evidence 801 and 803. Defendant opposed the motion. The trial court allowed the officer's testimony under Rule 803(3), as evidence of J.B.'s then-existing state of . mind at the time she

---

[2] In a post-judgment ruling, the trial court acknowledged that there were "a number of inconsistencies between the complaining witness's trial testimony and pre-trial statements to the police, testimony at a bail review hearing, and during a deposition."

reported the incident. Following J.B.'s testimony, the officer testified to conversations she had with J.B. in November and December of 2010, several months after the June incident with defendant, during which the officer stated that J.B. was concerned about defendant coming back into her life, wanted to do some safety planning with the officer, and wanted information about a trespass order issued by UVM against defendant and how a sexual assault report would affect that order. J.B. told the officer that she would be willing to make a report only if "it would completely sever [defendant] from the university."

¶ 16. ■ Defendant argues that admitting J.B.'s hearsay statements through the officer constituted reversible error because the statements were not made contemporaneously with the June incident; rather, they were made several months later.[3] Rule 803(3) allows for admission of out-of-court statements "of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as . . . mental feeling . . .)." As with the other hearsay exceptions listed in Rule 803, these statements are allowed in "because their trustworthiness is sufficiently high to justify admission even if the declarant is available to testify." Reporter's Notes, V.R.E. 803. Accordingly, the "circumstances of spontaneity" that accompany a declarant's then-existing state of mind are particularly important to this exception. *Id.*; see also 2 K. Broun, McCormick on Evidence § 274 (7th ed. 2014) ("As with statements of bodily condition, the special assurance of reliability for statements of present state of mind rests upon their spontaneity and resulting probable sincerity.").

¶ 17. ■ However, defendant misreads the moment in time that is crucial to the declarant's statements in this instance. The delay between J.B.'s statements to the officer and the incident with defendant is not dispositive, because these particular statements were offered to show J.B.'s state of mind *during her discussions with the officer* to explain why J.B. waited so long to report the incident to officials. The fact that J.B. was "concerned," worried for her safety, and wondering how her reporting the incident would affect the trespass order against defendant were relevant to show her state of mind "at the time of the statement" — after the

---

[3] Defendant also argues that the officer's statements were not admissible under Rule 801(d)(1)(B). As we hold that this testimony was properly admitted under Rule 803(3), we need not address defendant's Rule 801(d)(1)(B) argument.

incident but before she reported it. Broun, *supra*. The officer did not testify as to any of J.B.'s recounting of the events at the beach or her feelings at the time of the incident. Thus, as the hearsay statements did "not includ[e] a statement of memory or belief to prove the fact remembered or believed," V.R.E. 803(3), the court did not abuse its discretion by admitting these statements under the hearsay exception in Rule 803(3).

## II.

¶ 18. Finally, we address defendant's concerns regarding the effect of his immigration status on his sentencing and whether the sentence violates the constitutional prohibition against cruel and unusual punishment. Following the trial, the jury convicted defendant of nonconsensual sexual assault under 13 V.S.A. § 3252(a)(1). The court then held a sentencing hearing, which included testimony on defendant's immigration status and its effect on his potential punishment. First, the court heard from an attorney for the Prisoner's Rights Office of the Defender General, who explained federal immigration procedure for convicted felons and the impact of defendant's immigration status on a sentence to serve. The attorney testified that because sexual assault is a deportable offense under federal law[4] and defendant is not eligible for a waiver of deportation, in his opinion it was "guaranteed" that defendant would be deported after incarceration. Procedurally, the attorney stated, Immigration and Customs Enforcement (ICE) would send a detainer to the Department of Corrections (DOC) while defendant was in prison, and upon his release ICE would then take him directly into custody and commence deportation proceedings. The attorney further explained that defendant would be picked up by ICE only after he finished any to-serve sentence and that defendant would never be eligible to be out on probation.

¶ 19. The court then heard from a DOC probation officer, who testified regarding defendant's eligibility for sex offender treatment, which is a prerequisite for release of a sexual assault convict under 13 V.S.A. § 3271(d), if he was subject to a detainer. The officer testified that if defendant received a to-serve sentence instead of a split-to-serve sentence, defendant would not be eligible for treatment while there was a detainer on him, and thus the detainer would "have to be dropped or taken care of" before

---

[4] 8 U.S.C. § 1227(a)(2)(A)(iii).

he would be eligible for release. If defendant did not go through treatment, the officer stated that defendant would serve the maximum of any sentence awarded, directly affirming that if the maximum was life, defendant would serve a life sentence.

¶ 20. Following this testimony, the defense proposed that the court sentence defendant to the statutory minimum of three years to life, split-to-serve three years. The State requested a sentence of five years to life. Emphasizing what it saw as a failure by defendant to accept responsibility for the crime, the court sentenced defendant to serve eight years to life. In doing so, the judge stated that he had "no control over what the Department of Immigration does with [defendant]" and "that [defendant] will no doubt be deported." He then said: "I don't understand that process and I'm not going to attempt to, but it is a factor that I have to take into consideration."

¶ 21. Defendant argues that based on the sentencing hearing testimony, the inevitable issuance of a detainer means that DOC will not release him before the end of his maximum life sentence. As a result, defendant maintains that his sentence is effectively a life sentence without the possibility of parole, which he argues violates the Eighth Amendment prohibition against grossly disproportionate sentences. As part of defendant's argument, he contends that the trial court abused its discretion in failing to consider how DOC's internal policy against offering treatment to inmates who are subject to a detainer[5] would impact the severity of the sentence it awarded. We agree with this last argument.

¶ 22. As with evidentiary rulings, our review of sentencing matters is limited. *State v. Daley*, 2006 VT 5, ¶ 6, 179 Vt. 589, 892 A.2d 244 (mem.). Sentencing is solely the function of the trial judge, *State v. Artbeitman*, 131 Vt. 596, 599, 313 A.2d 17, 19 (1973), and we review an imposed sentence for abuse of discretion. *State v. Bushway*, 146 Vt. 405, 408, 505 A.2d 660, 662 (1985). "Absent exceptional circumstances, we will defer to the court's judgment so long as the sentence is within the statutory limits and was not based on improper or inaccurate information." *Daley*, 2006 VT 5, ¶ 6.

¶ 23. ▮ In giving trial judges wide discretion to fashion appropriate sentences, Vermont has adopted a situational sentenc-

---

[5] The parties do not dispute that defendant will almost certainly be subject to a detainer, though one is not currently in effect.

ing scheme whereby the court tailors the punishment within the statutory range to fit the defendant in question. When imposing a sentence, the court is required to consider a wide range of factors, including "the nature and circumstances of the crime, the history and character of the defendant, the need for treatment, and the risk to self, others, and the community at large presented by the defendant." 13 V.S.A. § 7030(a). As a result, "[s]entences are imposed with regard to the situation and nature of the offender as well as according to the crime charged." *State v. Cyr*, 141 Vt. 355, 358, 449 A.2d 926, 927 (1982).

¶ 24. ■ Though this Court is strictly limited in its review of sentences that fall within the statutory range, as the sentence here does, this case presents an example of "exceptional circumstances," *id.*, due to the unusual severity of the sentence caused by the interaction between defendant's immigration status and DOC's internal operating procedures. As stated above, we require trial courts to consider the individual defendant before them as well as the crime committed when imposing sentences. Such consideration must logically include circumstances particular to a defendant that would result in what is essentially a fixed sentence equal to the maximum.

¶ 25. ■ Here, the trial court heard testimony from two witnesses that due to the near-certainty of his being placed under a detainer, defendant would serve the maximum of any to-serve sentence because he would not qualify for required prerelease treatment under DOC rules. Having heard this evidence, which was uncontested by any witnesses from the State, the court should have considered the effect of a to-serve sentence and acknowledged such consideration through findings on the matter. Instead, the court declared that it did not understand the immigration process and would not attempt to. Later, the court stated that the sentence awarded was "in consideration of the fact that you may be subject to deportation at some point in the future," but there was no mention of the fact that defendant was likely facing a life sentence without parole. The lack of any findings whatsoever as to defendant's situation in light of the evidence presented at the sentencing hearing beyond the statement that defendant would "no doubt be deported, but that is nothing that I control" is indicative of the court's failure to consider whether the sentence issued would, in fact, be effectively

a determinate life sentence. Without any substantive indication of the court's understanding that such a sentence was likely the result, and only a declaration that it did not understand and refused to try to understand this possibility, we hold that the court did not adequately consider the factors presented by defendant's individual situation.

¶ 26. We note that this holding is not in conflict with our previous holding in *State v. Avgoustov*, where the noncitizen defendant objected to the sentencing court's consideration of his likely future deportation as a "neutral factor," arguing that he should have received a more lenient sentence in light of the additional consequence of deportation. 2009 VT 14, ¶¶ 8-10, 185 Vt. 610, 969 A.2d 139 (mem.) ("The fact that a defendant in a Vermont court may face incarceration under federal authority upon the expiration of his state sentence need not have any impact on the sentence the Vermont court imposes."). We declined to require sentencing courts to give more lenient sentencing treatment to noncitizen offenders than citizen offenders, and noted that the operation of federal law on a defendant's state-imposed sentence is not within the state court's control. *Id.* ¶ 9. Here, defendant's situation presents a different question from that which we addressed in *Avgoustov*. Deportation and any additional punishment it may impose on defendant is not at issue; rather, the issue we are addressing is whether the court properly considered defendant's individual situation and its effect on a potential sentence before fashioning such a sentence. The court in this case, like the sentencing court in *Avgoustov*, made findings regarding defendant's deportation — it found defendant "will no doubt be deported" and "considered the prospects of [defendant] being deported" — but made no comments or findings on the impact of DOC's policy regarding detainers on the sentence defendant would serve.

¶ 27. Thus, while the trial court did not have an obligation under *Avgoustov* to reduce the sentence awarded in consideration of imminent deportation upon release from prison, the court did have an obligation under Vermont's individualized sentencing process to examine defendant's case and to consider the consequences of his particular situation in fashioning a sentence. Stating that it did not care to understand these consequences was a failure of this obligation and an abuse of discretion; awarding a sentence range of which the only evidence presented at sentencing indi-

cated was not likely. to be a range at all required more from the court in the way of findings than the court provided. We therefore reverse and remand for resentencing in consideration of the ramifications of defendant's particular situation. As we reverse on these grounds, we do not reach defendant's Eighth Amendment claim.

*The trial court's evidentiary rulings are affirmed. Reversed and remanded for resentencing.*