NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 90

No. 2016-141

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windsor Unit, |
| | Criminal Division |
| | |
| Gregory Manning | March Term, 2017 |

Theresa S. DiMauro, J.

Heidi W. Remick, Windsor County Deputy State's Attorney, White River Junction, for
  Plaintiff-Appellee.

Matthew F. Valerio, Defender General, and Dawn Matthews and Marshal Pahl, Appellate
  Defenders, Montpelier, for Defendant-Appellant.


PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.  **REIBER, C.J.**  This appeal stems from an embezzlement case concerning four missing bank deposits defendant was entrusted to make for his employers. Following his jury conviction on a single count of embezzlement, in violation of 13 V.S.A. § 2531(a), defendant argues on appeal that: (1) the State's failure to preserve potentially exculpatory video evidence should have resulted in the trial court dismissing the charge or at least barring the State from presenting testimony concerning the video recordings in question; (2) the State's closing argument impermissibly shifted the burden to him to preserve the video evidence and improperly impugned his defense; and (3) given his continuing claim of innocence, the sentencing court's probation condition requiring him to complete a particular program in which he would have to accept

responsibility for his crime was not individually tailored to his case and thus constituted an abuse of the court's discretion. We affirm.

¶ 2. The record reveals the following facts. Defendant worked at the Corner Stop Mini Mart, located in Royalton, Vermont, for several years leading up to the incidents in question. He was a trusted employee and friend of the couple who owned the Mini Mart. As a trusted employee, he was responsible at times for making the store's bank deposits, including night deposits, at the local bank.

¶ 3. At the end of each shift, cashiers at the Mini Mart counted the money in the drawer, noted how much was in cash, change, and checks, and filled out a deposit slip. The money and deposit slip were then placed in a zippered bag to be deposited at the bank. A daily sales report was kept by the store for bookkeeping purposes. On days that defendant worked, he would take deposits to the bank. Otherwise, the cashier would drop the bag in the store's drop safe, and one of the store's owners would make the deposit. Defendant was the only employee allowed to make after-hours bank deposits.

¶ 4. At some point between mid-November and December 2013, the store owner who did the bookkeeping noticed a missing deposit. Due to the date of the deposit, October 26, she was not concerned because she thought it would appear on the November statement. When the deposit did not appear, she called the bank to inquire about the missing deposit. Soon thereafter, she noticed a second missing deposit, dated November 27. Several weeks later, she discovered two more missing deposits from December 14, 2013 and January 2, 2014. Defendant was working on all four dates and thus would have been responsible for taking the deposits to the bank. The four missing deposits totaled over $10,000: $2302 from October 2013, $2554 from November 2013, $3153 from December 2013, and $2077 from January 2014.

¶ 5. The bank made an initial search for the missing deposits, but found no record of the deposits on the dates in question or the days immediately after those dates for either the Mini Mart account or any other account. In early January 2014, the regional security manager for the bank

2

began investigating the missing deposits. After reviewing security camera footage, she did not observe defendant on October 26, 2013;[1] however, footage from the other three dates appeared to show defendant approaching the after-hours drop box with the deposit bag, but then either holding the bag in the box and withdrawing it or placing the bag in his coat before putting an empty hand in the box.

¶ 6.　At the security manager's invitation, she, a Royalton police officer, the store owners, and defendant watched the camera footage from the November and December incidents together. Regarding the November deposit, defendant claimed he was having trouble with the deposit box, and the bag would not drop in properly.　He alleged he returned to the bank a day later to make the deposit in person with a teller.[2]　Defendant's wife testified at trial that she accompanied defendant the Friday after Thanksgiving to make the November deposit.　Regarding the December deposit, defendant claimed that two money bags were stuck together, one of which was empty, and that he pulled back only the empty bag out of the deposit box while dropping in the one containing money.

¶ 7.　After viewing the camera footage of the night deposits, defendant requested in writing that security videos be preserved for the night deposit on November 27 and 28 and for the entire day on November 28 and 29, as well as December 14 and 16.　The security manager replied in writing that the federal Gramm-Leach-Bliley Financial Privacy Act prohibited the bank from honoring his request without a subpoena.　Defendant never provided the bank with a subpoena.

---

[1] The October deposit would have occurred during the day because defendant's shift ended in the early afternoon.　The remaining missing deposits would have occurred after the store closed, via the bank's night deposit box.

[2] Defendant claimed that after having trouble with the night deposit box on November 27, 2013, and not being able to make the deposit, he returned to the bank the next day to deposit the money in person with a teller.　As the bank security manager testified, November 28 was Thanksgiving Day and thus the bank was closed.　The manager reviewed camera footage for the two days thereafter—November 29 and 30—to see if defendant returned to make the deposit.　The internal bank camera footage from those days was not saved.

3

¶ 8.     In February 2014, the security manager and the Royalton police officer reviewed the internal bank camera footage from November 29 and 30.  The officer testified that he did not seek a warrant to obtain copies of the footage because he "did not see the defendant come into the bank and give the deposit to a teller" like the defendant stated he did.

¶ 9.     In early March 2014, the Royalton officer learned of the missing January deposit and contacted the bank to see if there was any relevant camera footage. The bank produced security footage that showed defendant walking to the night depository and then walking away without depositing anything.  Regarding that incident, defendant testified that he had issues with the deposit box and brought the deposit home, later returning to the bank to deposit it with a teller.

¶ 10.    On June 16, 2014, defendant was charged with embezzling money in excess of $100 between October 26, 2013 and January 2, 2014, in violation of 13 V.S.A. § 2531(a).  At arraignment the following day, defendant pleaded not guilty and was released on bail.  After a two-day jury trial held July 22 and 23, 2015, defendant was convicted of embezzlement.  Defendant filed a motion for judgment of acquittal, or alternatively, for a new trial, arguing that: (1) the evidence was insufficient to establish that he came into possession of his employer's money; and (2) the State's repeated claims that defense counsel could have subpoenaed interior bank camera footage were unsupported by any evidence that the footage at issue was available to be subpoenaed by the time he was arraigned on the embezzlement charge.  The trial court denied defendant's motion, stating that the evidence was sufficient for the jury to find defendant guilty beyond a reasonable doubt and that, in noting defense counsel's ability to have subpoenaed the video footage, the State was responding to defense counsel's cross-examination regarding the bank's failure to preserve the footage.  Following a hearing, the court sentenced defendant to one to five years, all suspended except for thirty days.  His sentence was subject to several probationary conditions, including a condition that he complete the Restorative Justice Program to the satisfaction of his probation officer.

¶ 11. Defendant now appeals, arguing that: (1) the State failed to preserve interior bank camera footage that was potentially exculpatory evidence; (2) the State's closing argument impermissibly shifted to him the burden to preserve the camera footage and improperly impugned his defense; and (3) the probation condition requiring him to complete the Restorative Justice Program was not individually tailored to his circumstances.

¶ 12. Regarding his first claim of error, defendant argues that the "real issue" is a denial of due process based on the State's failure to preserve potentially exculpatory evidence. He contends that, under this Court's three-part test set forth in State v. Bailey, 144 Vt. 86, 475 A.2d 1045 (1984),[3] and later reaffirmed in State v. Delisle, 162 Vt. 293, 648 A.2d 632, he is entitled to dismissal of the charge or at the least a new trial in which the State would be precluded from presenting any testimony concerning the viewing of interior bank camera footage that was no longer available and had not been preserved by the State.

¶ 13. As an initial matter, we address the State's claim that defendant failed to adequately raise his due process claim during the trial court proceedings. As the State points out, during the thirteen months before trial when he was represented by counsel, defendant neither subpoenaed the interior videos from the bank[4] nor filed a motion in limine to prevent the State from presenting testimony concerning the videos.

¶ 14. In her opening statement at trial, the prosecutor told the jury, with respect to the November missing deposit, that although defendant claimed he made the deposit during bank hours the next day after having trouble with the night deposit box the previous evening, police and bank personnel viewed interior bank camera footage of the two following bank days but did not

---

[3] Bailey was abrogated on other grounds by Arizona v. Youngblood, 488 U.S. 51 (1988).

[4] The record contains no evidence as to exactly when the relevant interior bank camera footage was recorded over. Although defendant was told in early February 2014 that he could not obtain the videos without a subpoena, he was not charged until June 2014. Hence, it is unclear whether the videos still would have been available when he could have obtained them via a subpoena.

see defendant enter the bank to make a deposit. The bank security manager later testified on direct examination that she reviewed the bank's interior camera footage for those days. When the prosecutor asked her if she was "able to find any indication . . . ," defense counsel objected that this was "hearsay in disguise" in that the prosecutor was really getting the security manager to say that the video did not show anything. Defense counsel also argued that the manager's answer would violate the best evidence rule because the interior video footage was not preserved despite defendant's request that it be preserved. The court ruled that the video recording was not an out-of-court statement, as defense counsel argued, and that if defendant was going to testify that he came in later during bank hours to make the deposit, the manager is "going to have to get back on the stand to rebut that." Following this exchange, the prosecutor changed subjects, and the manager provided no further testimony regarding the interior bank camera footage.

¶ 15. During cross-examination of the Royalton police officer, defense counsel elicited testimony that the bank allowed the officer to view interior bank camera footage of the days in question but would not provide him with a copy of the footage without a warrant, which the officer never obtained. On redirect examination, when the prosecutor asked the officer why he determined that it was not necessary to get a warrant to obtain a copy of the camera footage, defense counsel objected based on the best evidence rule, to which the court replied that the officer was not yet talking about the contents of the video and that the State was merely obtaining testimony in response to defense counsel's suggestion during cross-examination of the officer that he should have gotten a warrant. The officer then testified, in response to the prosecutor's question, that based on what he "observed in the video," he "did not see the defendant come into the bank and give the deposit to a teller like he stated . . . he did."

¶ 16. Following his brief cross-examination of the officer, defense counsel renewed his objection to testimony concerning the interior bank camera footage. A lengthy discussion ensued among the attorneys and the court after the jury was excused for a recess. The discussion centered around the exceptions to the best evidence rule. Defense counsel did not explicitly claim a

6

violation of due process or mention the three-part <u>Bailey</u> test during the discussion. The parties, however, debated whether the State could have and should have obtained copies of the interior bank footage, given defendant's primary defense—that he had made the deposits later during regular bank hours after having trouble with the deposit box—and whether the State was attempting to present testimony concerning what was observed on the unretained camera footage.

¶ 17. In light of this record, it is questionable whether defendant adequately preserved his claim on appeal that the State's failure to preserve the interior bank camera footage violated his right to due process pursuant to the <u>Bailey</u> test. Compare <u>State v. Lettieri</u>, 149 Vt. 340, 344, 543 A.2d 683, 685 (1988) ("An objection made on the wrong grounds and overruled below precludes a party from making a different objection on other, tenable grounds on appeal.") with <u>State v. Porter</u>, 2014 VT 89, ¶¶ 9-10, 197 Vt. 330, 103 A.3d 916 (concluding that defendant's hearsay objection was sufficient to preserve issue of admissibility under Vermont Rule of Evidence 602 because "issues of hearsay and personal knowledge are closely linked in this case"). We need not resolve this question, however, because we conclude that, even assuming defendant properly preserved an objection based on a violation of due process claimed to be the result of the State's failure to preserve exculpatory evidence, defendant has failed to show a reasonable possibility that the interior bank camera footage would provide exculpatory evidence, and thus this case does not meet the threshold requirement and fall within the due process protections of <u>Bailey</u>. As we stated in <u>Delisle</u>:

> In <u>Bailey</u>, we held that <u>if</u> a defendant shows a reasonable possibility that the lost evidence would be exculpatory, then the proper sanctions depend upon a pragmatic balancing of three factors: (1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial.

162 Vt. at 310, 648 A.2d at 642-43 (citation and quotations omitted) (emphasis added); cf. <u>Bailey</u>, 144 Vt. at 94, 475 A.2d at 1050 (although ultimately ruling in favor of state based on balancing of

three factors, concluding that defendant had shown reasonable possibility that further testing of physical evidence would have been favorable to him in light of hospital test results).

¶ 18.    As the trial court stated at the sentencing hearing, "[i]t could hardly be clearer" from viewing the night deposit video recordings "what [defendant] did."  The recordings, which the jury viewed multiple times, plainly showed defendant on three separate occasions pantomime putting the deposit bags into the box but then not depositing the money either because he kept the bag in his hand or because he had placed the bag in his jacket before placing his empty hand in the box.  The recordings provide no support for defendant's claims that the box was not operating properly or that on one occasion two bags were stuck together and he pulled back only the empty one.  Notably, defendant did not contend that he pantomimed depositing the money in the box but later changed his mind and deposited the money during regular bank hours; rather, he insisted that he tried to deposit the money but for various reasons was unable to do so on two of the occasions in question.  The video recordings of the night deposits demonstrably show otherwise.

¶ 19.    In addition to the unambiguous video recordings, the State presented evidence of the bank's unavailing attempts to locate the missing deposits by searching the night deposit logs for the time period in question, reviewing video of the night deposit vault being emptied to see if bank procedures were followed, and examining bank records to see if the deposits were credited on the wrong date or to the wrong account.  The State also presented evidence that defendant had never told the Mini Mart owners of any problems with the night deposit box on the dates in question and that the bank had reviewed service records of the night deposit box during the period in question but found no record of any malfunction or complaints about the box not functioning properly.  Given all of this evidence, defendant cannot show a reasonable possibility that interior bank camera footage from the dates in question would have produced exculpatory evidence.  Accordingly, his claim of a due process violation pursuant to Bailey is unavailing.

¶ 20.    In a related argument, defendant contends that during closing argument the prosecutor improperly impugned his defense and impermissibly shifted onto him the burden of

8

preserving evidence. Regarding the latter claim, the prosecutor did not mention the absence of the interior bank camera footage in her initial statement during closing argument. In response to the prosecutor's closing argument, defense counsel emphasized the inadequacy of the police investigation. Referring to the suggestion during trial that the defense could have subpoenaed the interior bank camera footage requested by defendant, defense counsel asked the jurors: "Did you hear anything about it being available for subpoena at [the time] this case was actually filed in court?" During her rebuttal statement, the prosecutor stated, "[W]hat [defense counsel] isn't telling you is that the defense has the power to obtain those videos." Defense counsel objected and moved for a mistrial, arguing that he did not have the opportunity to subpoena the videos. After the court denied the motion, the prosecutor noted that the bank security manager told defendant the videos could not be obtained without a subpoena, and then stated to the jury:

> So frankly, we'll never know why [defendant] did or didn't [subpoena the interior bank footage] but that would just be speculation but frankly for him to come here and argue that you should throw a case out because the bank didn't turn over evidence that he didn't request through the process available to him is just unfair.

Again, defense counsel objected, and the court overruled the objection.

¶ 21. As noted above, because there was no evidence indicating when the requested interior bank camera footage was recorded over, it is not clear whether defense counsel had an opportunity to obtain the footage after defendant was charged. But to the extent the prosecutor's comments erroneously suggested that defendant had the burden of obtaining exculpatory evidence or went beyond reasonable inferences that could be drawn from the evidence presented at trial, State v. Madigan, 2015 VT 59, ¶ 30, 199 Vt. 211, 122 A.3d 517 ("The longstanding rule in Vermont is that counsel should confine argument to the evidence of the case and inferences properly drawn from it." (quotation omitted)), the comments amounted to harmless error in light of the weighty evidence of guilt discussed above. See id. ¶ 32 ("When the admission of evidence, exclusion of evidence, or propriety of argument is objected to in the trial court and raised on appeal,

we review for harmless error, determining whether (1) the ruling was erroneous, and (2) if so, whether a substantial right of defendant was affected." (quotation omitted)); State v. Herring, 2010 VT 106, ¶ 4, 189 Vt. 211, 19 A.3d 81 ("In the event of error, we may nevertheless uphold a conviction if we find that the error was harmless beyond a reasonable doubt." (quotation omitted)).

¶ 22.   Nor do we find reversible error with respect to defendant's claim that the prosecutor improperly impugned his defense.  In her closing argument, after detailing the evidence presented in support of each of the elements of the charged offense by analogizing to building a wall brick by brick, the prosecutor stated:

> All of this talk that you've heard about what records the bank did or didn't keep or bags sticking together or the night deposit not working, all of that is the defense attorney's equivalent and no offense to [defense counsel] because he is doing his job, that's the defense attorney's equivalent of, hey look, a squirrel.  It's just noise. It's distraction.  It doesn't come close to knocking down this wall. It doesn't even poke holes in the mortar holding these bricks together.

Defense counsel began his response by stating, "I can tell you, offense is taken," but he did not object to the prosecutor's statement.  In her rebuttal statement, the prosecutor continued her theme of labeling defense counsel's arguments as creating a distraction:

> All this business about the bank transitioning and the compressed video and whether or not the deposit box sticks, all of that, you know, whether the police did everything in their investigation they could have or should have done that's, again with no disrespect to [defense counsel], that's just noise.  That's distraction.  [Defense counsel] hopes that if he blows enough hot air—

This time, defense counsel objected, stating that it was improper for the prosecutor to argue about what he was hoping for.  After the court overruled the objection, the prosecutor stated:

> It is the job of the defense to try and knock down the wall.  Clearly, [defense counsel] is offended by what I have said but I recognize he is doing his job.  I'm asking you not to be distracted by those efforts to knock down what we discussed is a solid wall of evidence.

¶ 23.   On appeal, defendant does not reiterate his objection that the prosecutor improperly commented on what he was hoping for, but rather argues now that the prosecutor improperly

impugned his defense. We agree that the prosecutor's comments went too far. As the prosecutor stated to the jury, it was defense counsel's job "to try and knock down the wall." Defendant's "squirrel" and "hot air" comments were improper in that they moved beyond challenging defendant on the evidence to disparaging defendant's efforts to mount a defense. See Madigan, 2015 VT 59, ¶ 30 ("While counsel are entitled to a good deal of latitude in their closing arguments, they are bound to keep within the limits of fair and temperate discussion . . . circumscribed by the evidence in the case." (quotations omitted)); cf. Rehkop, 2006 VT 72, ¶ 34, 180 Vt. 228, 908 A.2d 488 (stating that prosecutors' statements conveying opinion about case have long been condemned because they create risk that jury will give special weight to opinion due to prestige and power of office). Nevertheless, for the reasons noted above, viewing the record in its entirety and considering the weight of evidence against defendant compared to the transgression at issue, we cannot conclude that the comments deprived defendant of a fair trial. See State v. Gates, 141 Vt. 562, 566-67, 451 A.2d 1084, 1086 (1982) (stating that improper argument standing alone, without showing of prejudice, "is insufficient to overturn a conviction").

¶ 24. Lastly, defendant argues that the trial court abused its discretion at sentencing by requiring him to complete the Restorative Justice Program, which defendant claims would require him to admit his guilt. According to defendant, because he has consistently denied his guilt, including at sentencing, requiring him to successfully complete the program "doomed [him] to fail to comply with that condition if he maintained his innocence." In defendant's view, this amounted to a failure to consider his individual circumstances when imposing the condition. See State v. Lumumba, 2014 VT 85, ¶ 27, 197 Vt. 315, 104 A.3d 627 ("[T]he court did have an obligation under Vermont's individualized sentencing process to examine defendant's case and to consider the consequences of his particular situation in fashioning a sentence.").

¶ 25. We disagree. "Vermont law authorizes a sentencing court to set probation conditions that reasonably relate to the crime committed or that aid the probationer in avoiding criminal conduct." State v. Moses, 159 Vt. 294, 297, 618 A.2d 478, 480 (1992). Defendant argues

11

that the condition requiring him to complete the restorative justice program was improper because it was not tailored to help him lead a law-abiding life. We conclude that the condition was within the sentencing court's discretion, given the circumstances of this case. The restorative justice program is designed to "build understanding, encourage accountability and provide an opportunity for healing." Promoting a Restorative Approach to Conflict and Crime in Vermont Communities, http://cjnvt.org/ [https://perma.cc/F3YB-Q244]. Defendant was convicted of embezzling from his employers, who were also close friends. His crime was a breach of trust in a long-term friendship and working relationship. Nothing in the record confirms defendant's claim that completing the Restorative Justice Program will require him to admit his guilt. But assuming that to be true, the condition is appropriate irrespective of defendant's continued claim of innocence, as long as there are proper protections.[5]

Affirmed.

FOR THE COURT:

_____
Chief Justice

---

[5] Defendant does not argue that that the condition requiring him to complete the Restorative Justice Program violates his Fifth Amendment privilege to be free from self-incrimination. Cf. State v. Cate, 165 Vt. 404, 417, 683 A.2d 1010, 1019-20 (1996) (holding that in order to protect probationer's privilege against self-incrimination in situations where sentencing court has ordered defendant to admit guilt as part of sex-offender program and prosecutor has failed to eliminate threat of future prosecution based on those admissions, probationer must be given judicial use immunity making inadmissible in any subsequent criminal proceeding any statements required for successful completion of program and must be advised of such immunity at sentencing); State v. Rickert, 164 Vt. 602, 603, 665 A.2d 887, 888-89 (1995) (mem.) (rejecting petitioner's argument that finding probation violation based on his denying underlying charges in Domestic Assault Education Program violated his privilege against self-incrimination, insofar as petitioner had not argued that his denials might incriminate him in later proceedings and because protection against double jeopardy ensured that he would face no threat of future prosecution for challenged admissions).