NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 142

No. 2014-009

State of Vermont

v.

Peter A. Goewey

Supreme Court

On Appeal from
Superior Court, Bennington Unit,
Criminal Division

March Term, 2015

Nancy Corsones, J.

William H. Sorrell, Attorney General, and Sarah Katz and John Treadwell, Assistant Attorneys
General, Montpelier, for Plaintiff-Appellee.

Matthew F. Valerio, Defender General, and Marshall Pahl, Appellate Defender, Montpelier, for
Defendant-Appellant.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.    **EATON, J.**    On July 15, 2013, defendant Peter Goewey, then age sixty-one, pleaded guilty to one count of aggravated sexual assault in violation of 13 V.S.A. § 3253(a)(9) for repeatedly performing oral sex on a young man. At a contested sentencing hearing in December 2013, defendant was sentenced to twenty years to life. Defendant challenges this sentencing decision, alleging various constitutional and procedural errors. For the reasons stated herein, we affirm.

¶ 2. Defendant and the State entered a plea agreement, in exchange for which the charge was amended and other charges against defendant were dismissed. The plea agreement contemplated a contested sentencing hearing allowing the State to argue for a sentence of up to forty years to life to serve and defendant to argue for a sentence of ten years to life, split to serve five years.

¶ 3. Section 3271(b) of Title 13 requires an indeterminate life sentence following a conviction for aggravated sexual assault, such as was the case here, and thus the maximum sentence was necessarily required to be life. Pursuant to 13 V.S.A. § 3253, the trial court was required to impose an unsuspended term to serve of at least ten years, but could reduce that term to not less than five years if certain findings were made. There was no agreement whether the trial court was bound to impose a sentence to serve with no portion suspended on probation— that is, a straight sentence—or whether it could impose a suspended sentence with a specified portion to serve—that is, a split sentence.

¶ 4. At the sentencing hearing, the State provided testimony from the probation officer who prepared the presentence investigation report (PSI). Based upon an assessment done in the course of preparing the PSI, and due to a prior conviction, the probation officer referred defendant's case to the Department of Corrections (DOC) high-risk sex offender committee. The DOC high-risk committee does not make a determination of risk designation until after the sentence has been imposed. Accordingly, as of the date of sentencing, there was no final determination whether defendant would be designated as high-risk by the DOC, nor any indication by the probation officer whether a high-risk designation was likely or not.

¶ 5. The designation as a high-risk sex offender subjects an offender to 28 V.S.A. § 204b, which provides:

2

A person who is sentenced to an incarcerative sentence for a violation of any of the offenses listed in subsection 204a(a) of this title and who is designated by the Department of Corrections as high-risk pursuant to 13 V.S.A. § 5411b while serving his or her sentence shall not be eligible for parole, furlough, or any other type of early release until the expiration of 70 percent of his or her maximum sentence.

¶ 6.    Defendant's conviction was for a listed offense under § 204a(a): 13 V.S.A. § 3253(a)(9).[1]

¶ 7.    Prior to sentencing the trial court was made aware that the "70% rule" in § 204b would apply if defendant was designated as high-risk after sentencing and if he was given a straight sentence to serve rather than a split sentence with a fixed period to be served and the balance of the sentence suspended with defendant placed on probation.  At the sentencing hearing, the probation officer indicated that he was uncertain how the DOC applied the 70% rule when the maximum sentence is a life term.  Despite this uncertainty, the trial court proceeded with sentencing, and regardless of the significant potential difference in the time defendant would likely be required to serve between a straight and a split sentence were he to be designated high-risk, the trial court made no comment about why it had rejected defendant's repeated requests for a split sentence when imposing the straight sentence of twenty years to life.[2]

¶ 8.    During the imposition of sentence, the trial court referred to the victim as being "repeatedly sodomized" by defendant.  The prosecutor attempted to clarify that the charges against defendant involved oral sex, but the trial court indicated it was relying on the Webster's

---

[1]  Offenses listed in § 204a(a) include those specified in 13 V.S.A. §§ 2601, 2602, 3252, 3253, 3253a, 2405(a), and an offense involving sexual exploitation of children in violation of 13 V.S.A. chapter 64.

[2]  Even if defendant was designated as high-risk, he would be entitled to challenge the designation pursuant to 13 V.S.A. § 5111b(b).  Further, defendant is entitled to petition the DOC every two years seeking a change in his high-risk designation.

dictionary definition of sodomy, which included oral sex. In relying on this term, the trial court did not make reference to the nature of the conduct as between members of the same sex. Defendant's attorney made no objection to the trial court's characterization of defendant's assaults upon the victim as constituting sodomy.

¶ 9. Defendant also offered in mitigation of a long jail sentence his physical infirmities, including diabetes, a heart condition, and back and neck problems. In determining that the medical conditions would not be given much weight in mitigation, the judge noted that she had recently considered medical conditions as strong mitigating factors with another defendant, who had already violated her probation.

¶ 10. Defendant raises numerous claims of error concerning the trial court's imposition of the sentence: (1) that the trial court relied on prejudicial information when considering defendant's sexual assaults as sodomy; (2) that the 70% rule is a violation of separation of powers, constitutes cruel and unusual punishment, and allows the DOC to enhance a sentence on facts not found by the jury; (3) that the trial court erred in not considering the impact of the 70% rule in this case; and (4) that the judge's comments constituted improper reliance on the conduct of another person in determining defendant's sentence.

¶ 11. This Court engages in limited review of sentencing matters and will defer to the trial court's judgment absent an abuse of discretion. State v. Daley, 2006 VT 5, ¶ 6, 179 Vt. 589, 892 A.2d 244 (mem.); State v. Bushway, 146 Vt. 405, 408, 505 A.2d 660, 662 (1985). For this reason, the Court will uphold an imposed sentence as long as it is not based on improper or prejudicial information and is within the statutory range, Daley, 2006 VT 5, ¶ 6, which requires consideration of statutory factors, including "the nature and circumstances of the crime, the history and character of the defendant, the need for treatment, and the risk to self, others, and the

4

community at large presented by the defendant." State v. Lumumba, 2014 VT 85, ¶ 23, 197 Vt. 315, 104 A.3d 627 (quoting 13 V.S.A. § 7030(a)).

¶ 12. The parties do not dispute that the imposed sentence is within the statutory penalty provided for the offense.

¶ 13. We turn first to the claim that the sentencing judge relied on prejudicial information in imposing sentence by referring to the victim as having been "repeatedly sodomized" by the defendant. Although not objected to by defendant and raised for the first time on appeal, defendant argues that the trial court's characterization of his criminal acts of oral sex with a member of the same sex as "sodomy" is an expression of a religious view or moral judgment by the judge about sexual practices, which impermissibly tainted the sentencing hearing.

¶ 14. A trial court may not base sentencing decisions on "personal bias or animus against the defendant." State v. Ingerson, 2004 VT 36, ¶ 10, 176 Vt. 428, 852 A.2d 567. Furthermore, a trial court may not be influenced by personal religious beliefs in imposing a sentence; to do so results in a denial of due process. Torres v. State, 124 So.3d 439, 442 (Fla. App. 2013). A sentence should be vacated when a trial court's comments " 'could reasonably be construed to suggest that the trial judge based [the] sentence, at least in part,' on a constitutionally impermissible factor." Id. at 441 (quoting Nawaz v. State, 28 So.3d 122, 125 (Fla. App. 2010)).

¶ 15. In Torres, a case involving a conviction for sexual battery, the sentencing judge engaged in a lengthy discussion with the defendant about the defendant's claim that the sexual relations he had with a woman were consensual. Among other comments, the judge said, "Just because your wife is in another country doesn't mean you ought to be going out with other

5

women.  You're a good Catholic fellow as I am.  That's not the way Catholic people—that's not the way anybody with morals should do anything."  Id. at 440-41.  After making further comments about the defendant's lack of fidelity to his wife, the judge imposed the maximum sentence.  The appellate court held that the judge's comments could reasonably be construed as basing the sentence, at least in part, upon religious beliefs.  Id. at 442.  The court vacated and remanded the sentence "[b]ecause the [judge's] comments could reasonably be construed as basing the sentence, at least in part, on religion, and because we cannot say that the sentence would have been the same without the court's impermissible consideration of religion."  Id.

¶ 16.    In United States v. Bakker, 925 F.2d 728 (4th Cir. 1991), the court found the sentencing judge's comments concerning religion constituted a denial of due process in the imposition of a sentence on renowned televangelist James Bakker for mail fraud.  During sentencing, the judge said, "He had no thought whatever about his victims and those of us who do have a religion are ridiculed as being saps from money-grubbing preachers or priests."  Id. at 740 (emphasis in original).  In reversing the sentence, the court held:

> Our Constitution, of course, does not require a person to surrender his or her religious beliefs upon the assumption of judicial office. Courts, however, cannot sanction sentencing procedures that create the perception of the bench as a pulpit from which judges announce their personal sense of religiosity and simultaneously punish defendants for offending it.

Id. at 740.

¶ 17.    Here, defendant argues that the trial court's characterization of oral sex between defendant and victim as "sodomy" is impermissible during a sentencing hearing.  Defendant suggests that the inherently negative historical connotations underlying the term sodomy renders its use impermissible during sentencing.  Defendant focuses on the origin of the term, which is derived from the Old Testament where the Kingdoms of Sodom and Gomorrah were

6

unredeemably sinful and were destroyed after divine judgment. Genesis 19:23-26 (King James). Defendant also focuses on the term's modern definition, which includes a common thread of moral judgment based on the sinfulness or unnatural nature of homosexual acts. See, e.g., Black's Law Dictionary 1396-97 (7th ed. 1999) (defining sodomy as oral or anal copulation between humans, especially of the same sex, and also termed "abominable and detestable crime against nature; unnatural offense"). Defendant contends that by using the term, the trial court expressed an inherently negative judgment on non-coital and homosexual intercourse.

¶ 18. The trial court's use of the term "sodomy" was in the context of describing the nature of defendant's relationship with the victim, and not related to the fact that both parties were male. The trial court stated that the relationship between defendant and victim "culminated in nothing less than [the victim] being repeatedly sodomized by [defendant]." When the use of the term was objected to by the State, the trial court clarified that "the court's definition of sodomizing a child, is engaging in oral sex."

¶ 19. The term "sodomy" remains in use in the criminal codes of several states.[3] Despite this, given its historical application, continued use of the term in connection with sexual practices can carry a pejorative connotation. It is clear from the record here that the judge's reference to sodomy, which was a passing one, was not intended to convey a personal religious or moral judgment concerning same-sex sexual practices. On the contrary, the judge intended the comment merely to describe the sexual acts using what she felt was ordinary parlance, as she quickly indicated by referring to the Webster's Dictionary. The comment may be viewed as inappropriate, but it was not used with moral or religious intent. Indeed, defendant's attorney did

---

[3] These states include California, Georgia, Kentucky, Michigan, Missouri, Oregon, Utah, and Virginia.

not find the comment objectionable at the time it was made. Likewise, we do not now find the use of the term in the context of this case as one that could reasonably be construed as basing the sentence, at least in part, on religious beliefs or moral judgments. Thus, we do not find the sentencing judge relied on improper factors in imposing the sentence.

¶ 20. Next, defendant raises several challenges to the 70% rule, most of which were not raised below. Our rules require a party to raise and preserve all objections at trial, and we do not ordinarily consider issues not raised for the first time on appeal. See State v. Ovitt, 2005 VT 74, ¶¶ 13-14, 178 Vt. 605, 878 A.2d 314 (mem.) (refusing to consider sentencing issue that was not properly raised and preserved below).

¶ 21. With respect to the preserved arguments regarding the 70% rule, defendant argues that the trial court erred in imposing a sentence that is effectively a life sentence without the possibility of parole. The State argues that any challenge to the application of the 70% rule is not ripe until appellant has served the twenty-year minimum sentence imposed in this case. Specifically, the State contends that until the minimum sentence of twenty years has been served, addressing the application of the 70% rule, which applies only against the maximum sentence, amounts to an advisory opinion. The State further notes that defendant may challenge the designation of "high-risk" by use of petition for administrative review pursuant to 13 V.S.A. § 5111b(b), which appellant may request every two years, and that the Legislature may change the 70% rule before defendant has completed his minimum sentence.

¶ 22. We reject the State's argument. It is true that defendant has not yet been designated as high-risk, although his case has been referred to the high-risk designation committee. In some respects, it may seem premature to consider the implication of the 70% rule prior to a high-risk designation. However, since the DOC will not make that determination until

8

after defendant's sentence has been imposed, a refusal to consider the application of the 70% rule would deprive defendant the opportunity to challenge its application in any direct appeal, leaving potential relief under Vermont Rule of Civil Procedure 75, or a later administrative challenge to the designation, as his only available remedies. Because deferring a consideration of the applicability of § 204b against indeterminate life sentences until after the high risk designation has been made would deprive defendant the opportunity of a challenge on direct appeal, we find consideration of the issue timely.

¶ 23. Further, if there is a defect in the sentence which was imposed, the defect exists at this time. There is no reason why defendant should have to wait twenty years to address a potential problem with the sentence under which he is currently in execution. Errors made at sentencing are appropriate for review upon direct appeal. This Court has considered problems with a sentence which have not yet occurred but yet have the potential to do so. See Lumumba, 2014 VT 85. In Lumumba, the Court addressed the potential impact of deportation proceedings likely resulting from the court's sentence on the effective sentence the defendant would be required to serve, despite the absence of any federal detainer or pending deportation proceedings. Id. ¶ 2. Although the defendant's minimum sentence was years in the future and the provision at issue or his immigration status were subject to change before either had any effect on the defendant, the Court concluded that the sentencing court was required to consider circumstances particular to the defendant, including those "that would result in what is essentially a fixed sentence equal to the maximum." Id. ¶ 24.

¶ 24. Because defendant has potential exposure to the 70% rule, and because he had potential exposure to it at the time this sentence was imposed, we find the claims concerning the

9

impact of the 70% rule are ripe at this time. We do not, however, find defendant's arguments concerning separation of powers or constitutional concerns with the 70% rule to be meritorious.

¶ 25. Government in Vermont is constitutionally divided into three co-equal branches, each of which is separate and distinct and which shall not exercise powers belonging to the other branches. Vt. Const. ch. II, § 5. In analyzing the powers of the respective branches, we have articulated them as being: legislative power to formulate and enact laws, executive power to enforce laws, and the judicial power to interpret and apply laws. In re D.L., 164 Vt. 223, 228, 669 A.2d 1172, 1176 (1995). In examining whether actions of one branch of government improperly invaded the province of the judicial branch of government, so as to constitute a violation of the separation of powers doctrine, we have applied the following test:

> (1) whether the actions at issue are judicial functions or are reasonably necessary or incidental to the discharge of a judicial function;
> (2) whether the court's role in another department's affairs is merely advisory;
> (3) whether the judiciary has any discretion in accepting or rejecting the delegated actions; and
> (4) whether the actions impair the independent institutional integrity of the judiciary.

Id. at 229, 669 A.2d at 1176-77 (citations omitted). An absolute division of powers is not required, and some overlap in the application of powers by each branch is both necessary and inevitable. State v. Pierce, 163 Vt. 192, 195, 657 A.2d 192, 194 (1995).

¶ 26. Although sentencing of a criminal defendant always involves the judicial branch, this does not mean that sentencing power lies exclusively within the judiciary. See, e.g., Mistretta v. United States, 488 U.S. 361, 364 (1989) ("[s]entencing . . . never has been thought to be assigned by the Constitution to the exclusive jurisdiction of any one of the three Branches of Government."). In fact, quite the opposite is true—each branch of government has involvement

10

in sentencing. First, the legislative branch considers and enacts appropriate penalties for criminal offenses. This includes establishment of minimum and maximum sentences for offenses and may also include legislative determinations of how much of an imposed sentence must be served before parole eligibility. See 13 V.S.A. § 7031 (establishing form of sentences and minimum and maximum terms). The executive branch has power in the sentencing process by determining which charges are pursued and whether plea agreements are offered, and by making sentencing recommendations. In Vermont, the executive branch also administers the sentence and makes a host of judgments along the way that can significantly impact the duration and character of an offender's actual sentence as served. We have specifically recognized that the power to define appropriate sentences is shared by the courts with the Legislature, which not only defines the jurisdiction of the courts, but also defines the appropriate sentences for each offense, and with the executive branch. See State v. Saari, 152 Vt. 510, 518 (1989) ("[T]he power to define the appropriate sentence is shared by the courts with the legislature, which traditionally has set minimum and maximum sentences, as well as with the executive, which . . . has the prerogative to select the charge and request a specific sentence.").

¶ 27. Viewed in this light, we do not find the 70% rule, in cases where it applies, to constitute a usurpation of judicial power. The extent of an imposed sentence that is required to be served at any given time may vary with the vicissitudes of legislative enactments, such as so-called truth-in-sentencing legislation. 13 V.S.A. § 7031. Indeed, the establishment of minimum and maximum potential sentences is largely, if not wholly, a legislative function. The 70% rule represents a legislative determination, as would be the case with a criminal penalty which the Legislature has determined cannot be suspended, deferred, or served as a suspended sentence,

such as those pertaining to certain repeat-offense driving-under-the-influence convictions. 23 V.S.A. § 1210.

¶ 28. The 70% rule does not increase a sentence imposed by the judicial branch. Rather, the 70% rule impacts only the portion of the imposed sentence a defendant must actually serve, which is a reflection of legislative judgments, or in the case of parole, a determination involving exercise of authority by the executive branch.

¶ 29. Defendant's argument that the 70% rule permits an enhancement of a sentence without a jury determination of aggravating factors suffers from similar infirmities as his separation of powers argument. We have considered the constitutionality of enhancing sentences through a determination of aggravating factors made by a judge rather than a jury in State v. Provost, 2005 VT 134, 179 Vt. 337, 896 A.2d 55. Provost followed Apprendi v. New Jersey, where the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). In Provost, which involved a conviction for first degree murder, the Court concluded that the statutory maximum sentence for Apprendi purposes meant the maximum sentence the judge could impose without any additional findings, which was life imprisonment with a minimum term of thirty-five years. The Court concluded that the trial court's determination to increase the sentence to life without parole on the basis of facts, other than a prior conviction, which the jury did not find beyond a reasonable doubt, was a violation of the Sixth Amendment. 2005 VT 134, ¶ 15.

¶ 30. The problem with defendant's argument is that the 70% rule is not an enhancement of a potential sentence to a different and harsher one, which might trigger the Provost concerns. The sentence imposed by the court remains the sentence for which the

12

defendant will be in execution. The imposition of life as the maximum sentence is not a function of § 204b, but of 13 V.S.A. § 7231, which requires a maximum sentence of life for this offense. The amount of time defendant must actually serve is dependent upon many factors. In the appropriate case, the 70% rule would be one of them, triggered by the post sentencing determination of high-risk. The application of the 70% rule to a particular sentence, however, is not an enhancement of a sentence any more than would be a denial of parole once the minimum sentence had been reached.

¶ 31. Defendant also argues the sentence imposed was unduly harsh and disproportionate, so as to violate the constitutional protections against cruel and unusual punishment due to the application of the 70% rule effectively turning this sentence into a mandatory life sentence. Because we find the 70% rule is inapplicable in this case, we need not reach defendant's argument that its imposition would render the sentence cruel and unusual or that his sentence was disproportionately harsh due to the application of the 70% rule.

¶ 32. Although we do not find defendant's specific constitutional challenges to § 204b persuasive, we find § 204b inapplicable to the sentence imposed here for another reason. In 2006, the Legislature added 13 V.S.A. § 3271, which requires the maximum term of a sentence imposed for certain enumerated sexual crimes to be imprisonment for life. In 2009, the Legislature added § 204b, requiring high risk designees of offenses listed in 13 V.S.A. § 204a to serve 70% of their maximum sentence. Some of the listed crimes in § 204a that will trigger the 70% rule under §204b are also crimes for which mandatory maximum terms of life imprisonment are required pursuant to 13 V.S.A. § 3271(b). In crimes subject both to the mandatory life maximum and potentially to the 70% rule, the obvious question, unanswered by § 204b, is what constitutes 70% of life imprisonment?

13

¶ 33.     In creating the 70% rule in § 204b, the Legislature obviously intended it to apply to fixed-period maximum sentences, that is, those which are measured by a term of years.  We construe a statute according to its plain, ordinary meaning.  Heisse v. State, 143 Vt. 87, 89, 460 A.2d 444, 445 (1983) (citing State v. Baldwin, 140 Vt. 501, 509–10, 438 A.2d 1135, 1139 (1981) ("The most elemental rule of statutory construction is that the plain meaning of the statute controls. If confusion or ambiguity does not appear, then the statute is not construed but rather is enforced in accordance with its express terms.")); State v. Deyo, 2006 VT 120, ¶ 14, 81 Vt. 89, 915 A.2d 249 (citing Tarrant v. Dep't of Taxes, 169 Vt. 189, 196-97, 733 A.2d 733, 739 (1999) ("[W]e presume the Legislature intended the express meaning of [plain and unambiguous] language, and we enforce [the statute] according to its terms without resorting to statutory construction")).

¶ 34.     In order to determine the percentage of a whole, there must be a quantifiable whole to measure the percentage against.  Because the length of a person's remaining life is unknown, 70% of that length is likewise unknown.  An attempt to determine 70% of life in the absence of a quantifiable maximum becomes the equivalent of trying to measure how high is up. In short, in these circumstances there is no plain meaning.  Because calculating 70% of life is not possible, we are left with the conclusion either that the Legislature did not intend § 204b to apply to cases involving mandatory life sentences or that it did not consider the statute's application in those instances.  Either way, the statute cannot be construed in any sensible manner when trying to determine what constitutes 70% of life.  We cannot be left to guess at a statute's meaning or its application.  See, e.g., Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)  ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common

14

intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.").

¶ 35. There is no way to apply § 204b to this life-maximum sentence in a way which comports with the statutory mandate that a high-risk sex offender is not eligible for release until having served 70% of the maximum sentence. Moreover, there is nothing in the legislation which authorizes DOC to create its own policy on how to calculate this otherwise incalculable number. To be sure, there are sex-offense sentences with quantifiable maximums to which the 70% rule can be easily applied and thus the statute is not unduly vague in all instances. When measured against a quantifiable whole, 70% of that figure is easily determined. In those instances the Legislature has determined, as is their province, that 70% of the maximum should be served upon a high-risk designation. But this is not the case where we are left to speculate as to what constitutes 70% of life for purposes of compliance with § 204b. We hold, therefore, that the 70% rule of § 204b does not apply in cases where the length of the maximum sentence is imprisonment for life, because 70% of that time is not capable of determination.

¶ 36. Lastly, we do not find the judge's comments concerning her recent experience with considering medical factors as a basis for mitigation in another case to be improper reliance upon conduct of another person as influencing defendant's sentence. The sentencing judge recounted an earlier experience with another defendant in expressing her general view about medical conditions as mitigating factors, which is not improper. For example, it would be acceptable for a judge to express an opinion about the advisability of interrupted sentences to serve based upon the past or perceived opportunity those sentences present for the introduction of contraband into a correctional facility. The sentencing judge went on to consider whether defendant's medical conditions were mitigating factors in light of the facts of this case, noting

that defendant had been afflicted with the medical conditions for years but that those afflictions "were not such that they had prevented him, or even slowed him down, from committing this felony sexual offense." The consideration of defendant's medical conditions given by the trial judge was appropriately directed at a proper sentence for this defendant and not improperly influenced by the actions of another person. Consideration of this defendant's individual circumstances was what was required and what was given. Lumumba, 2014 VT ¶ 23; 13 V.S.A. § 7030(a).

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 37. **ROBINSON, J., concurring.** I have no reason to question the majority's conclusion that the trial court used the term "sodomy" here in good faith, believing that term to be an appropriate and accurate way to describe the conduct at issue, rather than as an expression of the court's moral condemnation of certain kinds of sex acts, or as an indication of the court's improper bias on the basis of sexual orientation. I write this separate concurrence to stress that the trial court's characterization of the sexual assaults in this case as "sodomy," and its emphasis on that characterization in describing the horror of what happened, although not reversible error, added confusion rather than clarity to the trial court's analysis, was totally inappropriate, and had no place in a sentencing hearing.

¶ 38. The trial court's description of defendant's conduct as "sodomy" created unnecessary confusion because, as the trial court's own reasoning reflects, the term "sodomy" is

16

an umbrella term that encompasses a varying range of acts, including but not limited to the oral sex at issue in this case. If the sentencing court's objective was to describe the unlawful, nonconsensual sex act that gave rise to the aggravated sexual assault charge in this case with more specificity, as the majority suggests, the court's terminology did almost nothing to narrow the field. Although the court's language excluded penile-vulvar contact from the range of acts it was describing, it included every other type of sex act included in the sexual assault statute. See 13 V.S.A. § 3251(a) ("A 'sexual act' means conduct between persons consisting of contact between the penis and the vulva, the penis and the anus, the mouth and the penis, the mouth and the vulva, or any intrusion, however slight, by any part of a person's body or any object into the genital or anal opening of another."). In fact, the court arguably used a term that swept in categories of conduct not even addressed in the sexual assault statute. See Merriam-Webster's Online Dictionary (Sept. 21, 2015), http://www.merriam-webster.com/dictionary/sodomy [http://perma.cc/CK9G-ZNXT] (defining "sodomy" to include copulation with an animal). If the sentencing court's goal was to describe what happened in this case, simply referencing the conduct as "oral sex"—rather than describing it as sodomy and then clarifying that the definition of sodomy is broad enough to encompass oral sex—would have provided the clarity and specificity that the court may have been seeking.

¶ 39. The court's terminology was inappropriate because the common feature characterizing the various sex acts sometimes included in the definition of sodomy is that they were, at common law, considered "unnatural," "perverted," or "crimes against nature." For example, Black's Law Dictionary, defines "sodomy" as follows:

> 1. Oral or anal copulation between humans, esp. those of the same sex. 2. Oral or anal copulation between a human and an animal; bestiality. —Also termed buggery; crime against nature;

> abominable and detestable crime against nature; unnatural offense;
> unspeakable crime; (archaically) sodomity.

Black's Law Dictionary (10th ed. 2014). Whatever the court's intentions may have been, the thrust of its using the term "sodomy" was that defendant engaged in sex acts with the victim that were "abominable and detestable crime[s] against nature." Id. The defining attribute of "sodomy" is the social condemnation associated with the sexual acts described by that term, so it's understandable that defendant would perceive the court's comments as an expression of social condemnation.

¶ 40. Our modern sexual assault statute makes no distinction between nonconsensual sex acts of the sort historically deemed "unnatural" or deviant, and those that were not. See 13 V.S.A. § 3251(a). The sentencing court's invocation of the concept of "sodomy" drew a distinction between the sexual act at issue here (and every other act included in the definition of "sexual act" in the sexual assault statute except for conduct consisting of contact between the penis and the vulva) and penile-vulvar contact that is not supported by the statute.

¶ 41. What is shocking about the crime here is defendant's grooming of a young victim over a period of time, and the nonconsensual nature of the sexual acts—not the fact that they did not involve penile-vulvar contact. By using a term that is defined by an archaic moral judgment about which consensual sexual behaviors are normal and acceptable, and which are crimes against nature, the trial court may have inadvertently given the impression that it was relying on considerations that are not supported in the statute, and are constitutionally problematic. See Lawrence v. Texas, 539 U.S. 558, 571 (2003) ("The issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal

18

law. 'Our obligation is to define the liberty of all, not to mandate our own moral code.' " (quoting Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 850 (1992))).

¶ 42. In order to validate the trial court's word choice, the State and majority point to the fact that statutes on the books in some other states use the term "sodomy." This argument misses the point. First, some of the statutes referenced by the majority are, at least in part, unconstitutional and unenforceable in light of the United States Supreme Court's decision in Lawrence. 539 U.S. at 578; see, e.g., Ga. Code. Ann. § 16-6-2(a)(1) ("A person commits the offense of sodomy when he or she performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another."). Moreover, some state statutory regimes still distinguish between rape—forcible sexual intercourse involving penile-vulvar contact—and forcible "deviate sexual intercourse"—sexual assault involving other types of oral-genital or anal-genital contact. See, e.g., Or. Rev. State. Ann. §§ 163.305, 163.355, 163.365, 163.375, 163.385, 163.395, 163.405 (defining and regulating non-consensual sex involving heterosexual intercourse separate from non-consensual sex involving the other kinds of sexual acts included in Vermont's sexual assault statute). As noted above, the Vermont Legislature has rejected this distinction, and it has no footing in Vermont law. See Baker v. State of Vermont, 170 Vt. 194, 232, 744 A.2d 864, 891 (1999) (Dooley, J., concurring) ("Although Vermont, like all states, once criminalized sodomy, and had a "fellation" law, it repealed this law in 1977 and does not now prohibit, or otherwise restrict, homosexual conduct between adults, except on the same terms that it restricts heterosexual conduct." (citations omitted)).

¶ 43. The reason the trial court's statement had no place in a sentencing hearing is that it reasonably could be construed to reflect a bias against lesbian and gay people. So far, my discussion has focused on the impropriety of singling out nonconsensual sexual acts not

19

involving penile-vulvar contact for special condemnation under our sexual assault statute, without regard to whether the offender and victim are of the same sex. But the issue here isn't just that the sentencing court's language suggested a disapproval of non-procreative sex acts. Although at common law "sodomy" described a class of sex acts without regard to the genders of the participants, in contemporary American society, the link between the epithet "sodomite" and homosexuality is undeniable. The common understanding that "sodomy" is synonymous with same-sex relations is reflected in our everyday conversation, news stories, dictionary definitions, and even United States Supreme Court opinions. See, e.g., H. Branson-Potts, Judge strikes down proposed 'Sodomite Suppression Act' calling for killing of gays, L.A. Times (June 23, 2015, 4:21 PM) http://www.latimes.com/local/lanow/la-me-ln-antigay-sodomite-suppression-act-struck-down-20150623-story.html [http://perma.cc/38GH-B33Q]; Merriam-Webster's Online Dictionary (Sept. 24, 2015), http://www.merriam-webster.com/dictionary/sodomy [http://perma.cc/D83E-9WC6] (defining "sodomy" as "anal or oral copulation with a member of the same or opposite sex"); Lawrence, 539 U.S. at 570 ("The longstanding criminal prohibition of homosexual sodomy upon which the Bowers decision placed such reliance is as consistent with a general condemnation of nonprocreative sex as it is with an established tradition of prosecuting acts because of their homosexual character." (citing Bowers v. Hardwick, 478 U.S. 186 (1986))). When is the last time a heterosexual woman was publicly condemned as a "sodomite" for having oral sex with her boyfriend or husband?

¶ 44. Although I am confident that the sentencing court here did not intend to draw such a distinction, the trial court's gratuitous description of his conduct as "sodomizing" the victim could be interpreted as reflecting a view that the same-sex nature of the sexual assault in this case made it particularly offensive. I am quite sure that if defendant had engaged in the

same grooming conduct with an adolescent girl, and then repeatedly had nonconsensual vaginal intercourse with her, the sentencing court would have been equally appalled by his behavior. But defendant is not unreasonable in asking whether the sentencing court's emphasis that he "repeatedly sodomized" the victim suggests that the court is particularly disgusted by same-sex sexual assaults—a suggestion that has no place in Vermont's courts.

¶ 45.    I am authorized to say that Justice Skoglund joins in this concurrence.

_____

Associate Justice