*Manning v. State of Vermont*, 75-2-17 Wncv (Teachout, J., Dec. 4, 2018)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                          **CIVIL DIVISION**
**Washington Unit**                                  **Docket No. 75-2-17 Wncv**

**JAMES MANNING**
      **Petitioner**

**v.**

**STATE OF VERMONT**
      **Respondent**

## DECISION
### Petitioner's Application for Postconviction Relief

This matter came before the court for final evidentiary hearing on August 10, 2018. Petitioner James Manning was present and was represented by Attorney Emily Tredeau. The State was represented by Adam Korn, authorized intern supervised by Attorneys Bram Kranichfeld and Ultan Doyle.

Petitioner seeks relief from several convictions to which he pled guilty in 2014. He asserts violations of "rights to due process and effective assistance of counsel." The due process claim appears to be based on a lack of voluntariness of the plea based on misinformation about his chances of early release.

## Findings of Fact

The court finds the following facts based on a preponderance of the evidence.

James Manning grew up in Burlington but was living in Barre at the time of events giving rise to criminal charges. He was 21 years old and the leader of a group of 14 to 15-year-olds in Barre that called itself the Brotherhood Mafia. The members engaged in acts of vandalism in the community and engaged in sexual conduct. Mr. Manning engaged in sexual acts with many of the youths. Although he was 21, his developmental level was later identified during an evaluation as being comparable to that of the adolescents in the group.

In January of 2013, he was charged with six counts of sexual assault of persons under the age of 16 as well as other crimes. These were serious charges. If convicted on all counts, the minimum sentence would be 14 years. The following month, Attorney James LaMonda was assigned as his attorney under an assigned counsel contract.

Mr. LaMonda engaged in discovery and deposed four of the witnesses. He concluded that although Mr. Manning acknowledged sexual conduct with several people under age 16, the State's case had weaknesses. Specifically, some of the witnesses were

not reliable and gave inconsistent accounts of what had happened or had other problems with credibility. Moreover, the State had alleged that Mr. Manning had used physical force in connection with assaults, and he concluded that although the victims were not old enough to consent to sexual activity and any conduct was a crime, there were indications that the nature of the activities had, at least to some degree, involved adolescent sexual exploration rather than coercive force. He wrote a letter to the prosecuting attorney laying out such weaknesses and his position that discovery evidence did not support the accusations in full and seeking discussion about a possible plea bargain.

A few years before, the Legislature had enacted a statute providing for what became known as the "70% Rule." See 28 V.S.A. § 204b ("A person who is sentenced to an incarcerative sentence for a violation of any of the offenses listed in subsection 204a(a) of this title and who is designated by the Department of Corrections as high-risk pursuant to 13 V.S.A. § 5411b while serving his or her sentence shall not be eligible for parole, furlough, or any other type of early release until the expiration of 70 percent of his or her maximum sentence."). The rule would potentially apply to Mr. Manning as the charged crimes were listed offenses. The applicability of the rule to Mr. Manning was a serious consideration and important factor in addressing how to proceed. This was the first case in which Mr. LaMonda had occasion to deal with the 70% Rule, and he sought advice from more experienced counsel. He was very aware of its possible impact on the amount of time Mr. Manning would serve under any sentence, whether as a result of trial or plea.

At the same time that Mr. LaMonda represented Mr. Manning in the Washington County case, Mr. Manning also had pending charges out of Rutland County. Mr. LaMonda did not represent him in that case, but the attorneys had joint conversations, and he understood that the Rutland case was likely to add 5 years to any sentence resulting from the Barre charges.

Plea discussions resulted in an agreement for pleas and a sentence of 5–20 years. This was considerably less than the maximum exposure, and the outcome of trials was hard to predict given the witnesses and nature of the evidence. The amount of actual time Mr. Manning would spend in jail was dependent on the risk assessment level DOC would assign to him and the applicability of the 70% Rule, and he had not yet been evaluated. Because the difference in possible minimum sentences between the plea agreement terms and maximum exposure was significant (5 years vs. 14 years), Mr. LaMonda was confident that if the post-plea evaluation resulted in a high-risk determination, Mr. Manning would be able to withdraw his plea and reconsider his options. Mr. LaMonda had never seen a judge refuse to allow a withdrawal under that type of circumstance. Mr. Manning understood from Mr. LaMonda that if he committed a new crime, his risk level designation could be high and he could be subject to the 70% Rule.

On May 12, 2014, Mr. Manning entered pleas consistent with the plea agreement. At the time he entered the pleas, Mr. Manning was interested in being able to do programming to address his sexual conduct and in being eligible for release as close as

2

possible to his minimum sentence. He intended to follow prison rules and become eligible for release as soon as possible. He understood that there were no guarantees about when he could be released on parole or any other status, but he hoped to have "a shot" at getting out as soon as possible and engaging in programming. He had talked with Mr. LaMonda and understood that once he received a risk level designation, DOC could change it later if he reoffended. At the time of the plea, he had not yet received a risk level designation. At the plea hearing, Mr. LaMonda asked for the risk assessment to be completed prior to sentencing. As a result of the pleas, an evaluation was ordered with a sentencing to occur at a later date.

Between the time of the plea hearing and the sentencing 3 ½ months later, several things happened. The psychosexual evaluation was completed by Dr. Gilligan and Mr. Manning's likelihood of recidivism was determined to be 'moderate to high.' However, the DOC assessed his risk level at 'low to moderate' based on the fact that his crimes had all occurred in a "cluster." This was good news for Mr. Manning and Mr. LaMonda, as it meant that the 70% Rule was not certain to be applied and he had a chance at being released close to the 5-year minimum, possibly at 4 ½ years on furlough.

Mr. LaMonda discussed the situation with Susan Wells, the DOC officer who was expected to be the one supervising Mr. Manning's case. Mr. LaMonda understood from her that if Mr. Manning were to reoffend, then his risk level could change, and the 70% Rule could then become applicable. Mr. LaMonda advised Mr. Manning of this.

Mr. LaMonda testified at the PCR hearing that he understood the risk level could not change based on any conduct that DOC knew about at time of sentencing, but only based on post-sentencing conduct. He says he advised Mr. Manning of this, as the possible application of the 70% Rule was a significant factor in the situation. Mr. Manning testified at the PCR hearing that he believed that his risk level could change only if he were convicted of a new crime.

There is no clear evidence about exactly what Mr. LaMonda told Mr. Manning between the plea and sentencing. Mr. LaMonda's account at the PCR hearing of his understandings and beliefs four years prior does not provide sufficiently clear evidence of exactly what was said, and neither does Mr. Manning's testimony at the PCR hearing about his "belief" at the time of the court events four years prior.

Between the plea hearing and the sentencing hearing, Mr. Manning was investigated for violating prison rules by engaging in oral sex with another inmate. He acknowledged the conduct. He discussed it with Mr. LaMonda, whose view was that it should not change his risk level as long as it occurred before sentencing and DOC knew about it and did not change his risk level before sentencing.

On August 14, before the sentencing hearing, Mr. Manning was accused of a disciplinary violation (DR) for the incident of oral sex with another inmate, which was against prison rules. On August 27, still before sentencing, he waived a hearing and admitted the violation and the violation was found, resulting in a DR. He has never been

3

charged with a crime based on the underlying conduct, although it appears that the conduct may qualify as a crime.

The sentencing hearing took place the next day, August 28th. Susan Wells testified. When asked about a possible increase in the risk level designation she testified as follows:

> Well, his [sic] after the preponderance of the PSI was done, I'm on the high-risk committee, and two other high-risk committee members, we reviewed all of the information including the psychosexual, and it was determined that he would not be at this point considered high risk, because all of his offenses, all of these victims, even though there are many of them, they're a cluster. He'd never been formally sanctioned. As no one ever said to him, Mr. Manning, that is not right. So there are cluster events. So therefore it didn't—there isn't like one index and all of these priors. It's just one cluster. So at this point in the game, he doesn't meet criteria for a high-risk designation."

> .   .   .

> If he was to sexually reoffend, new behavior, new victim, past—post-sentencing, he would—or if he was to be found the perpetrator in a prison rape enforcement act investigation, that could conceivably change his high-risk designation. It would be reviewed again. If he was to reoffend, he could have the seventy percent rule imposed.

Sentencing Hearing Transcript 19–20 (Aug. 28, 2014). Mr. LaMonda testified that he interpreted this to mean that the risk level could only change after sentencing if DOC learned about something it did not already know about, i.e. "post . . . sentencing." At the PCR hearing, he testified that he considered that DOC "knew" about the DR for sexual conduct because of the DR finding the day before. The fact of the August 27th DR, or when the high-risk committee made the non-high risk determination in relation to the August 27th DR, were never mentioned by anyone at the sentencing hearing. There was no mention of whether the risk designation could change as a result of the August 27th DR or the underlying conduct on which it was based.

Five and a half months after sentencing, on February 18, 2015, DOC sent Mr. Manning a letter stating that his risk level had been changed to high risk. This was based on the August pre-sentencing incident and resulted in the invocation of the 70% Rule with the result that he would serve considerably more time than he had hoped.

Mr. Manning testified at the PCR hearing that if he had known, at the time of entering his plea, that his risk level could go up based on something other than a crime, he would not have entered pleas that carried the possibility of a 14-year minimum.

4

Mr. LaMonda testified at the PCR hearing that if Mr. Manning's presentencing DOC risk evaluation had been high, he would have moved to withdraw the plea prior to a sentencing hearing. Mr. LaMonda also testified that if the risk level designation had been changed from low risk to high risk at time of sentencing, he would have moved to withdraw the plea, and he would have sought to renegotiate a new plea or go to trial. There is no way to know whether either of those options would have resulted in an outcome with more or less time incarcerated than would occur with the 70% Rule applied to the sentence resulting from the negotiated plea. It was not clear to Mr. LaMonda that a 5–20 year sentence with the application of the 70% Rule was the best outcome that could be obtained.

## Conclusions of Law

The thrust of Mr. Manning's PCR claim is that he reasonably relied on objectively wrong information about the 70% Rule in deciding to plead guilty to listed offenses. [1] The assertedly wrong information was that the 70% Rule would not be applied to him, regardless of the listed offenses to which he was pleading, unless he committed a new offense *after his sentencing was complete*. The criminal court accepted his plea and he began serving his agreed upon sentence. Later, the DOC designated him high risk, and therefore applied the 70% Rule to him, due to sexual misconduct he admittedly engaged in while incarcerated between his change of plea and sentencing hearings. He generally characterizes his claim as both ineffectiveness of counsel and involuntariness as to his plea.

*Ineffective assistance*

A petitioner seeking to establish ineffective assistance of counsel must first show that "counsel's performance fell below an objective standard of reasonableness informed by prevailing professional norms." *State v. Judkins*, 161 Vt. 593, 595 (1993). This showing usually must be supported by expert testimony. *In re Grega*, 2003 VT 77, ¶ 16, 175 Vt. 631. "A petitioner must then show actual prejudice—a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Judkins*, 161 Vt. at 595 (citation omitted).

There was simply no evidence presented to establish the standard of conduct for an attorney at either the initial plea colloquy hearing or the later sentencing or the period in between. The petitioner has not proved ineffective assistance of counsel.

---

[1] The plea agreement contemplated a specific sentence with no sentencing discretion for the criminal court but for the court to accept or reject the agreement. Mr. Manning entered his plea of guilty at the May 12, 2014 change of plea hearing. The criminal court accepted his plea at his "sentencing" hearing on August 28, 2014.

*Involuntariness based on misinformation*

"[M]isinformation regarding [eligibility for early release] may provide a basis for a successful attack on the voluntariness of a plea. At a post-conviction relief hearing, petitioner has the burden of demonstrating that he entered his plea while reasonably relying on a material misunderstanding regarding his [eligibility for early release], and that such misunderstanding worked to his prejudice. To support withdrawal of the plea, the misunderstanding must be more than a 'subjective mistake absent some objective evidence reasonably justifying the mistake.' '[O]therwise every plea would be subject to successful attack.' Petitioner must refer to specific circumstances and persons to support his testimony regarding the alleged misunderstanding." *In re Moulton*, 158 Vt. 580, 584 (1992) (citations omitted).

The so-called 70% Rule appears at 13 V.S.A. § 5411b (the high-risk designation) and 28 V.S.A. § 204b (the 70% consequence). It permits the DOC to designate an inmate sentenced to incarceration for a listed offense a high-risk sex offender. So long as he remains so designated, the consequence is that he "shall not be eligible for parole, furlough, or any other type of early release until the expiration of 70 percent of his . . . maximum sentence." 28 V.S.A. § 204b; see also Vt. Admin. Code 12-8-4 for the DOC rules on high-risk designations. "The 70% rule does not increase a sentence imposed by the judicial branch. Rather, the 70% rule impacts only the portion of the imposed sentence a defendant must actually serve, which is a reflection of legislative judgments, or in the case of parole, a determination involving exercise of authority by the executive branch." *State v. Goewey*, 2015 VT 142, ¶ 28, 201 Vt. 37.

The 70% Rule presents a conundrum for a defendant contemplating a guilty plea to a listed offense.[2] Nothing in Vermont statutes or relevant DOC rules requires the DOC to make an advance determination about whether it will in the future designate an offender high risk *prior* to a change of plea or sentencing hearing so that a defendant can plan for it. Nothing in Vermont statutes or relevant DOC rules prevents the DOC from so designating an inmate at any time during his incarceration. As the *Goewey* Court explained, the Rule affects the portion of the sentence an inmate actually will serve; it does not affect the sentence terms imposed by the judiciary. It does, however present a substantial unknown for any defendant contemplating a plea to a listed offense.

In this case, Attorney LaMonda handled this unknown by seeking guidance from the DOC, prior to the sentencing hearing, as to whether Mr. Manning would be

---

[2] While the conundrum for the defendant is real, it is hardly unique to the 70% Rule. In cases in which the 70% Rule does not apply, the DOC and the parole board nevertheless remain free to exercise their discretion to *not* grant early release as they see fit. Those discretionary decisions may be based on presentence conduct, post-sentence conduct, and differences over time in how those entities are prone to exercising their discretion. Early release, in all events, is discretionary with the DOC and the parole board and is not written into the sentence, creating a future unknown for a defendant considering the terms of a plea agreement.

designated high risk. He did this after Mr. Manning had entered his plea on May 12, 2014 (change of plea hearing) but before the sentencing court accepted his plea on August 28, 2014 (sentencing hearing). He explained at the PCR hearing that he believed that if the DOC had indicated that it would designate Mr. Manning high risk, then he would have expected the sentencing court to permit Mr. Manning to withdraw his plea.

While incarcerated between his change of plea hearing and his sentencing hearing, Mr. Manning engaged in prohibited sexual conduct and pleaded guilty to a disciplinary infraction.

At the sentencing hearing, Attorney LaMonda called Susan Wells to testify. She is the probation and parole officer who authored Mr. Manning's presentence investigation report (PSI). Mr. Manning relies heavily on her testimony as the source of the "wrong" information about the 70% Rule. There is no evidence that the PSI or any other written materials in evidence at the sentencing hearing addressed the DOC's position with regard to the 70% Rule in Mr. Manning's case. Attorney LaMonda did not ask Ms. Wells any questions about the 70% Rule. The State, however, did. Her testimony is set forth above.

Ms. Wells' testimony strongly implies that she was unaware of Mr. Manning's "new" sexual misconduct that had occurred just prior to the sentencing hearing. No evidence presented at the PCR hearing suggested otherwise. That misconduct presumably would not have been part of the "cluster" of criminal conduct giving rise to the assessment that Mr. Manning was not high risk. Attorney LaMonda did not ask Ms. Wells whether she had considered Mr. Manning's recent sexual misconduct and neither he nor Mr. Manning otherwise raised the matter during the hearing. There is no evidence in the record that Susan Wells was aware of the new sexual misconduct at the time of the sentencing hearing.

Ms. Wells' sentencing hearing testimony is reasonably interpreted to mean that the sex offender review committee had made at least a preliminary decision that the conduct giving rise to Mr. Manning's criminal charges would not qualify him to be designated high risk, based on the information before the committee at the time of its consideration of the issue. Ms. Wells stated clearly that subsequent criminal charges or sexual misconduct in prison could change that assessment.

To the extent that Ms. Wells referred to new charges or misconduct occurring *after sentencing* she appears to have done so because she was speaking *at sentencing* and was without any knowledge of any prior misconduct but for that giving rise to the criminal charges. To the extent that there was ambiguity about the effect of the intervening sexual misconduct, Attorney LaMonda did not resolve it by asking her about it.

There was a potentially potent reason to *not* raise the issue of Mr. Manning's new misconduct at the sentencing hearing. No one else had mentioned it. There is no evidence that anyone else there was aware of it. The new misconduct squarely conflicted

7

with Ms. Wells' rationale for not designating Mr. Manning high risk—that his misconduct that was evaluated was exclusively part of a specific "cluster." It also apparently conflicted with (or at least complicated) Mr. Manning's argument to the sentencing court in favor of accepting the plea agreement—that Mr. Manning was unusually contrite, focused on self-awareness, and profoundly interested in and suitable for programming and rehabilitation.

Ms. Wells did not in any objectively clear way assert that Mr. Manning for some reason was inoculated from a future high-risk designation due to any misconduct (known or not) that may have occurred prior to sentencing, or that he could be so designated only for conduct occurring after the date of sentencing. Mr. Manning did not mention his intervening misconduct in his testimony. Attorney LaMonda never raised it in questioning any witness or in argument. It is unnecessary to speculate whether Mr. Manning and Attorney LaMonda kept their silence for perceived strategic reasons or for some other reason. In all events, in context, Ms. Wells' testimony is not "objective evidence reasonably justifying" any misunderstanding Mr. Manning or Attorney LaMonda may have had.

There was no clear testimony or other evidence at the PCR hearing to the effect that he affirmatively advised Mr. Manning that he could not be designated high-risk due to new sexual misconduct that occurred between his change of plea hearing and his sentencing hearing. Thus, Attorney LaMonda's legal advice to Mr. Manning was not "objective evidence reasonably justifying" any misunderstanding Mr. Manning may have had. Mr. Manning has failed to demonstrate that there was a material misunderstanding with an objectively reasonable basis with regard to the 70% Rule that caused him to plead guilty.

There also is no proof of prejudice due to any misunderstanding, regardless whether it had any objective basis. Mr. Manning claims retrospectively that if he had known that he was going to be designated high risk then he would have withdrawn his plea and taken his chances at trial. Prejudice is not a backward-looking enterprise, however.

> Although petitioner testified that he would have gone to trial had he understood the parole eligibility policies, the present record establishes only that he knew that if he were convicted of the crime charged that he could receive a sentence of ten-to-fourteen years. To determine whether petitioner was prejudiced, the court must look at the circumstances confronting him at the time of the plea to determine if he would have withdrawn his plea and proceeded to trial had he not been improperly advised.

*In re Moulton*, 158 Vt. 580, 586–87 (1992). At the time of the sentencing, Mr. Manning had testimony from Ms. Wells that appeared to indicate that the DOC would not designate him high risk due to the conduct that gave rise to his criminal charges. He knew that he had engaged in separate sexual misconduct while incarcerated just prior to

8

his sentencing hearing, and it appears clear that Ms. Wells did not in any objectively reliable manner assert that his non-high risk designation included consideration of that intervening misconduct. In those circumstances, he chose to go forward with his plea.

Attorney LaMonda could have asked Ms. Wells specifically about whether the DOC would continue to consider Mr. Manning low risk despite the intervening misconduct. Neither he nor anyone else did, however, and there is no evidence to indicate what she would have said in response. While the DOC eventually did designate him high risk, there is no evidence to indicate that Ms. Wells would have so testified on the spot at the sentencing hearing. Thus, while Mr. Manning now says that he would have withdrawn his plea had he known at sentencing what the DOC was going to do in the future, the more salient issue in terms of a prejudice inquiry is what he would have done if Ms. Wells had been asked clearly what the impact of his intervening misconduct would be. This cannot be known on this record because Ms. Wells was never asked that. The prejudice inquiry does not look to how future events unfolded, but how circumstances would have been different at the time of the alleged misinformation if the defendant had not been "misled."

Mr. Manning has not demonstrated that he entered his plea while reasonably relying on a material misunderstanding regarding his eligibility for early release, and that such misunderstanding worked to his prejudice.


ORDER

For the foregoing reasons, Mr. Manning's petition for postconviction relief is denied.

Dated at Montpelier, Vermont this _____ day of December 2018.


_____
Mary Miles Teachout
Superior Judge